IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

325 GOODRICH AVENUE, LLC,          :
                                   :
        Plaintiff,                 :
                                   :
v.                                 :
                                   :        No. 5:10-CV-452 (CAR)
SOUTHWEST WATER COMPANY,            :
and JOHN DOE, [1]                  :
                                   :
        Defendants.                :
_____   :

<u>ORDER ON PARTIES' MOTIONS TO EXCLUDE AND
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

The following Motions are presently before the Court: Defendant Southwest

Water Company's ("SWWC") Motion for Summary Judgment [Doc. 40], SWWC's

Motion to Exclude Expert Testimony of Dr. Rubin Shmulsky [Doc. 54], and Plaintiff

325 Goodrich Avenue, LLC's ("Goodrich") Motion to Exclude Certain Expert

Testimony of Carl Michael Gates [Doc. 55].  Having considered the parties' Motions,

all responses and replies thereto, and the applicable law, SWWC's Motion for

_____

[1] At present, Goodrich has not identified Defendant John Doe.  Accordingly, pursuant to Rule 21 of the
Federal Rules of Civil Procedure, Goodrich's claims against Defendant John Doe are **DISMISSED**.  <u>See</u>
Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a
party.").

1

Summary Judgment [Doc. 40] is **GRANTED in part** and **DENIED in part**, and Goodrich's Request for Oral Argument [Doc. 77] is **DENIED**.  Additionally, SWWC's Motion to Exclude Dr. Rubin Shmulsky's Expert Opinion [Doc. 54] is **DENIED in part** and **TERMINATED as MOOT in part**, and Goodrich's Motion to Exclude Certain Expert Testimony of Carl Michael Gates [Doc. 55] is **GRANTED**.

## BACKGROUND

On October 8, 2008, water flowed out of an uncapped and severed standpipe (the "Flood") located on the first floor of two old warehouses ("Buildings A and B") on Goodrich's property at 325 Goodrich Avenue, Thomaston, Georgia (the "Property").[2] The Flood allegedly damaged the antique hardwood first floor of Buildings A and B resulting in damages in excess of $1 million.  In the instant action, Goodrich alleges that SWWC[3] caused the Flood and is thus liable for the resulting damages.  The facts in

---

[2] This case arises from the same factual background as the companion case filed before this Court, Faraday Capital Ltd. v. 325 Goodrich, LLC, No. 5:10-cv-278-CAR-CHW (the "Companion Case").  In the Companion Case, the central issue was whether Goodrich's insurance policy issued by Faraday Capital Ltd. ("Faraday") provided a covered cause of loss for the alleged water damage.  For additional facts pertaining to the procurement of the policy and the policy itself, see the Court's Order on the Parties Cross-Motions for Summary Judgment [Doc. 176] and the Court's Order on the Third-Party Defendants' Motions for Summary Judgment [Doc. 177].

[3] SWWC provides waste and water services to the City of Thomaston Water Department.  Throughout the record, the parties refer to the City of Thomaston Water Department employees as SWWC employees.  To avoid confusion, the Court will do the same.

the light most favorable to Goodrich, the non-movant on summary judgment, are as follows.

The Property

In June of 2008, Goodrich purchased the Property, a former B.F. Goodrich tire cord manufacturing facility known locally as Martha Mills, for $1.5 million.   The Property consisted of eleven buildings, including Buildings A and B, a water well, and two water towers.  Goodrich purchased the Property with the intention of renovating some buildings for historical tax purposes and salvaging some hardwood floors and steel pipes in the buildings for resale.  Shortly after purchasing the Property in June, Goodrich requested that SWWC discontinue the Property's water service, and SWWC accordingly complied.

Buildings A and B were both three-story brick warehouses, although Building A was substantially larger than Building B.  Both buildings had the same hardwood antique floors comprised of three different layers of wood: a maple top layer, a yellow pine middle layer, and a heart pine beams bottom layer.  As to be expected from the Property's previous use as a manufacturing facility and textile mill, certain areas of the floor were dirty, scratched, or oily.  At the time of the Flood, an uncapped and severed vertical water standpipe was located on the first floor of Buildings A and B.  It is

unclear whether these pipes were uncapped and severed during Goodrich's ownership, but, reading the facts in the light most favorable to Goodrich, this issue is irrelevant.

October 8, 2010 & the Flood

Matthew Molenkamp, Goodrich's Project Manager, was in charge of removing and salvaging the hardwood floors in Buildings A and B.  On the day of the Flood, October 8, 2010, Molenkamp was supervising the removal of precariously positioned steel pipes in Building A that posed a safety hazard to the eventual floor removal process.

That day around "lunchtime" water began "steadily flowing" from the open standpipes in both buildings and onto the first floors.  Matthew Molenkamp Dep. 21:9, 120:2 May 25, 2011 [Doc. 42 at 21].  At some point, likely sooner rather than later, Goodrich's employees who were removing pipes in Building A, notified Molenkamp. Upon arriving, Molenkamp instructed his secretary to call SWWC.  Once notified, SWWC employees "immediately" began working where the water line was controlled on the Property.[4]  Id. at 41:9 [Doc. 42 at 41].  From the time he arrived at Building A until the time the water stopped, no more than ten minutes had passed.  Molenkamp

---

[4] It is unclear if SWWC had been working on the Property prior to this phone call, but it appears that SWWC was relatively close to the Property beforehand.

4

estimates that water covered a combined total of 23,000 square feet of the hardwood floors in Buildings A and B, and in some places the water was two to three inches deep.

Shortly after the water stopped, Molenkamp and SWWC foreman, Albert Woodard, examined the Flood's aftermath.   While inside Building A, Woodard explained that SWWC had accidentally "cut on the valve" when they were trying to fix a water issue on another nearby property and reassured Molenkamp that the water would not hurt the "old wood."   Id. at 47:25 [Doc. 42 at 47].   In a subsequent deposition, Molenkamp testified that he could not remember what Woodard said about the Flood.[5]   Woodard testified that he did not "recall" anything about this conversation or the Flood.   Albert Woodard Dep. 13:21-14:15, June 22, 2011 [Doc. 71 at 4].

<u>After the Flood</u>

By that evening, Goodrich's employees had removed the water "to the best of [their] ability."   Molenkamp   Dep.   230:4,   May   25,   2011   [Doc.   42   at   230].

---

[5] Specifically, Molenkamp's second deposition states: "Q: And I believe you said [in your first deposition that] you didn't remember anything [Woodard] said while he was there?   A: "I don't remember, no, sir."   Molenkamp Dep. 446:20-22, June 27, 2011 [Doc. 50 at 50].   The Court notes that Molenkamp had previously testified that he *did* remember the conversation with Woodard.   <u>See</u> Molenkamp Dep. 47, May 25, 2011 [Doc. 42 at 47].

Notwithstanding their efforts, it still took "a few days" before the hardwood floors had completely dried.  Id. at 78:24 [Doc. 42 at 78].  The following day, on October 9, Goodrich filed a claim for damages with its insurance company, Faraday Capital Limited ("Faraday").

From the end of December 2008 through January 2009, Faraday commissioned three experts to inspect the extent of damage to Buildings A and B.  Dan Arnold, a fire protection engineer, investigated whether the standpipes were part of the sprinkler system; Christopher Dawkins, a building consultant, determined the general condition of the wood floors, and inspected, photographed, and conducted infrared examinations looking for moisture; and Carl Michael Gates, an insurance adjustor, calculated the actual cash value and replacement costs of the wood floors.

Goodrich  subsequently removed all of the wood floors in Building B, including the allegedly damaged wood from the first floor.  Goodrich sold the yellow pine and heart pine layers of the damaged flooring, but stored the top maple layer in Building A.  Goodrich also removed the entire second and a majority of the third floor in Building A, but did not remove the damaged first floor.

In November 2009, over one year after the Flood and over eight months after Faraday's experts conducted their investigations, Building B was demolished as part

of Goodrich's ordinary course of business.   Shortly after demolition, a portion of Building A's roof "caved in."   Id. at 79:13 [Doc. 42 at 79].   The record indicates that Goodrich never repaired the roof.

Goodrich's Wood Salvaging Business

The success of Goodrich's wood salvaging business leaves plenty of room for the imagination.   The little the Court was able to piece together is as follows: Before the Flood, Goodrich's business of selling salvaged antique wood was relatively new and no salvaged wood had been resold.   After the Flood, Goodrich began to sell wood in one of two conditions: as is or re-milled.   Depending on the amount of wood purchased, Goodrich sold the former materials for $1-$5 and the latter for $4-$9, although it is unclear whether this amount reflects the retail price of the undamaged or damaged wood from Building B.   The cited record is also silent as to Goodrich's cost of removal, cost of re-milling, or amount of profit, if any, that it realized for selling either type of wood.

Molenkamp's Arrest, July 2011

On July 21, 2011, Molenkamp was arrested by Chief Dan Greathouse and Officer Bobby Ellington of the City of Thomaston Police Department for demolition

without a permit.[6]  There is some dispute as to what, if anything, Molenkamp told the officers when he was arrested.   According to the officers' testimony, Molenkamp stated that he thought he was being arrested for the fraud against SWWC. Molenkamp, however, who was "frustrated and distraught" at the time of the arrest, does not remember.  Id. at 6:25 [Doc. 43 at 6].

Procedural History

Goodrich initiated the instant action against SWWC on November 23, 2010, after seeking, and subsequently obtaining, a consent Order by this Court to dismiss SWWC as a Third-Party Defendant to the Companion Case.   Goodrich presently asserts four claims against SWWC: nuisance, trespass, attorneys' fees, and punitive damages.

After initiating this suit, and thus, after the demolition of Building B, Goodrich retained Dr. Rubin Shmulsky, Professor of Forest Products at Mississippi State University, to investigate the existence and extent of damage to the flooring and the valuation of the sustained damage.  SWWC did not retain an expert to investigate the water damage, but has named two of Faraday's experts, Arnold and Dawkins, as its own potential expert witnesses.

_____

[6] The underlying demolition is irrelevant to the instant action.

Discovery concluded on September 1, 2011, and SWWC subsequently filed its timely Motion for Summary Judgment and Motion to Exclude the Testimony of Dr. Rubin Shmulsky.  Goodrich responded to both Motions and filed a Motion to Exclude Certain Testimony of Carl Michael Gates.  Neither party filed a Reply Brief to their respective Motions and the time for which to do so has expired.  Pursuant to the Court's request, the parties filed supplemental briefs on the issue of damages.  Docs. 83, 84].  Therein, Goodrich represents that it is seeking replacement costs for the antique flooring in Building A and diminution in value damages for the salvaged wood in Building B.

## MOTION FOR SUMMARY JUDGMENT

In its Motion for Summary Judgment, SWWC challenges Goodrich's nuisance, attorney's fees, and punitive damages claims in their entirety, as well as the causation element of its trespass and nuisance claims.  SWWC additionally argues that Goodrich's recoverable damages should be limited to only diminution in value.  Lastly SWWC argues that Goodrich should not recover damages for Building B because it was demolished.

### Legal Standard

9

Summary judgment must be granted if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.  See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

10

of material fact" and that entitle it to a judgment as a matter of law.  <u>Celotex</u>, 477 U.S. at 323.

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(e); <u>see also</u> <u>Celotex</u>, 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions.  <u>See</u> <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991).  Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."  <u>Celotex</u>, 477 U.S. at 323.

## Discussion

In its Response Brief, Goodrich concedes summary judgment on its claims for attorneys' fees and punitive damages.  Accordingly, SWWC's Motion is **GRANTED** with respect to those claims.  The Court will consider the remainder of SWWC's Motion and Goodrich's claims below.

1. <u>Nuisance</u>

11

SWWC first argues that Goodrich's nuisance claim fails as a matter of law because the alleged facts in the Complaint and the undisputed facts on summary judgment do not support a claim for nuisance.  In response, Goodrich concedes summary judgment on its nuisance claim and argues that the substantive allegations in its Complaint should be fairly read as a negligence claim.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that a plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2)  Additionally, Rule 8(e) demands that "pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).  Here, upon reviewing the allegations in the Complaint, the Court concludes that Goodrich's "nuisance" claim contains factual allegations sufficient to support the elements of a negligence claim, and thus, should be fairly read as a negligence claim.  To do otherwise would elevate form over substance.  See Douglas Asphalt Co. v. Qore, Inc., No. CV206-229, 2009 WL 368649, at *2 (S.D. Ga. Feb. 13, 2009).  To the extent, however, that Goodrich asserts a nuisance claim, SWWC's Motion for Summary Judgment [Doc. 40] with respect to such a claim is **GRANTED.**

2.  Causation

SWWC next argues that there is no genuine issue of material fact with respect to causation. Because proximate causation is required in claims for nuisance, trespass, *and* negligence under Georgia law,[7] and because it is unclear which claim(s) SWWC is challenging in its Motion, the Court will consider SWWC's causation argument with respect to Goodrich's remaining negligence and trespass claims. <u>See</u> <u>Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta</u>, 986 F. Supp. 1406, 1420 (N.D. Ga. 1997).

To establish causation under Georgia law, "[t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." <u>Grinold v. Farist</u>, 284 Ga. App. 120, 121, 643 S.E.2d 253, 254 (2007). However, "mere possibility of such causation" is insufficient. <u>Id.</u> Thus, "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant." <u>Id.</u> at 121-22.

SWWC makes several arguments with respect to causation but focuses mainly on the sufficiency of Molenkamp's testimony regarding Woodard's admission of

---

[7] In a diversity case such as this, "state law governs substantive issues and federal law governs procedural issues." <u>McDowell v. Brown</u>, 392 F.3d 12283, 1294 (11th Cir. 2004) (citations omitted). In this case, the parties do not dispute the application of Georgia law to substantive issues.

liability.  SWWC first argues that Molenkamp's deposition testimony does not create a genuine issue of material fact because it is self-contradictory.  The Court disagrees.

In Van T. Junkins & Assocs. v. U.S. Indus., Inc., 736 F.2d 656 (11th Cir. 1984), the Eleventh Circuit held that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  Id. at 657.  This ruling, however, is inapplicable here.

In this case, Molenkamp first testified that Woodard admitted SWWC turned on Goodrich's water valve.[8]  Subsequently in a later deposition, Molenkamp testified that he could not recall what Woodard had told him.  Thus, Molenkamp's first deposition, not his second, created the genuine issue of material fact with respect to whether SWWC caused the Flood.  Thus, because Molenkamp's subsequent testimony did not create the genuine issue of material fact with respect to causation, the Court declines to preclude Molenkamp's testimony.

The Court also concludes that the weight of Molenkamp's contradictory testimony is a credibility issue appropriate for a jury to consider.  There is a clear

---

[8] Neither party objects to the admissibility of Woodard's out of court statement, and the Court declines to address this issue *sua sponte*.

distinction between discrepancies that "create transparent shams" and discrepancies that "create an issue of credibility or go to the weight of the evidence." Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986). "[I]nstances of failed memory" should not be struck from the record because they create an issue of witness credibility and weight of the evidence to be resolved by the trier of fact. Croom v. Balkwill, 645 F.3d 1240, 1253 n.18 (11th Cir. 2011). Here, Molenkamp's subsequent deposition presents a credibility issue: "Q: And I believe you said [in your first deposition that] you didn't remember anything [Woodard] said while he was there?  A: I don't remember, no, sir." Molenkamp Dep. 446:20-22, June 27, 2011 [Doc. 50 at 50]. Disregarding opposing counsel's somewhat deceptive line of questioning, the Court concludes that Molenkamp's subsequent testimony that he could not remember creates an issue of credibility to be resolved by the jury.

In light of Molenkamp's testimony and the fact that its contradiction is best resolved by the trier of fact, the Court also concludes that Molenkamp's testimony creates a genuine issue of material fact with respect to proximate causation. To the extent that SWWC argues that more evidence must be presented by Goodrich to support causation because Molenkamp's testimony is contradictory, the Court disagrees. On summary judgment, a court must "determine whether there is any

[evidence] upon which a jury can properly proceed to find a verdict for the party producing it." <u>Shirley v. L. & N.R. Co.</u>, 327 F.2d 549 (5th Cir. 1964).[9]  In this instance, the Court concludes that based on the facts, a reasonable juror could conclude that SWWC caused the Flood.  Thus, Goodrich has carried its burden on summary judgment.

SWWC's remaining arguments are also without merit.  First, SWWC's vague theory that the water came from other possible sources on the Property is nothing more than speculation and conjecture and lacks any evidentiary support.  SWWC has not only failed to carry its burden of proving any alternative theories of causation, but also its burden on summary judgment by pointing to evidence that demonstrates an absence of a genuine issue of material fact.  <u>Moresi v. Evans</u>, 257 Ga. App. 670, 676-77, 572 S.E.2d 327, 333 (2002); <u>see</u> <u>Celotex</u>, 477 U.S. at 323.

Lastly, the Court is unclear why Molenkamp's statement to the police, even if evidence of fraud, is relevant to this Court's determination of causation on summary judgment.[10]   At best, SWWC is attempting to undermine Molenkamp's credibility.

---

[9] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[10] Goodrich argues that Molenkamp's statement is inadmissible hearsay under Rule 801(d) of the Federal Rules of Evidence because Molenkamp is not an agent of Goodrich.  The Court need not

16

Notwithstanding, such a credibility determination is improper on summary judgment. See Anderson, 477 U.S. at 255.

Accordingly, the Court concludes that the causation element of Goodrich's trespass and negligence claims is a genuine issue of material fact to be resolved by a jury.  Thus, SWWC's Motion for Summary Judgment with respect to the causation element of Goodrich's trespass and negligence claims is **DENIED**.

3.  Damages

SWWC next argues that Goodrich's damages for both buildings should be limited to diminution in value and that Goodrich should not recover lost profits or replacement costs.  At the outset, the Court notes that SWWC does not dispute whether Goodrich can prove damages at all, only that Goodrich's damages should be limited.  Thus, SWWC has waived any argument with respect to the damages element of Goodrich's negligence and trespass claims.

In its damages brief, Goodrich represents that it is seeking diminution in value costs for Building B and replacement costs for Building A.  Although Goodrich is not seeking lost profits for either building, the Court nevertheless concludes that such recovery is inappropriate.   Under Georgia law, "[i]f a retailer, wholesaler, or

_____

determine the admissibility of the statement as it is not a material fact relied upon by the Court in its decision.

manufacturer, who has suffered a loss from the destruction of inventory, wants to recover the reasonable expected markup that is represented by the sale price of the lost inventory, then [it] must meet the evidentiary burden of proof necessary to permit the recovery of lost profits." Champion v. Dodson, 263 Ga. App. 286, 290 n.3, 587 S.E.2d 402, 406 (2003).  In carrying this burden, a plaintiff must show not only the probable gain, but also the expenses incurred in realizing such profits.  Kitchen v. Hart, 307 Ga. App. 145, 152, 704 S.E.2d 452, 458 (2010).

A party may recover lost profits "only if the business has a proven track record of profitability."  Empire Shoe Co. v. NICO Indus. Inc., 197 Ga. App. 411, 414, 398 S.E.2d 440, 443 (1990).  Lost profits, therefore, are generally precluded for new businesses because its lost profits are "too speculative, remote, and uncertain."  Molly Pitcher Canning Co. v. Cent. Of Ga. Ry. Co., 149 Ga. App. 5, 10-11, 253 S.E.2d 392, 397-98 (1979).  It is not enough to simply rely on industry standards of a similar business to estimate lost profits as the estimation must be based on the businesses' own anticipated profits.  Mkt. Place Shopping Ctr., L.P. v. Basic Bus. Alts., Inc., 227 Ga. App. 419, 423, 489 S.E.2d 162, 166 (1997).

Notwithstanding, some courts have recognized a new business' subsequent history of profitability as an accurate estimation of its lost profits.  McDermott v.

18

Middle E. Carpet Co., Assoc., 811 F.2d 1422, 1427-28 (11th Cir. 1987); Crider v. Convenience Food Sys., Inc., No. CV604-102, 2005 WL 3299563, at *4 (S.D. Ga. Dec. 2, 2005); see Reynolds v. Fla. Highway Prods., Inc., No. CV507-78, 2008 WL 5430332, at *6 (S.D. Ga. Dec. 31, 2008) (relying on subsequent profitability holding in McDermott and Crider to deny lost profits to new business that did not show subsequent profitability).

In addition to not offering prior history of profitability, Goodrich also does not show any subsequent history of profitability.  On summary judgment Goodrich only offers the retail price range of the as is and re-milled wood, and does not point to the portions of the record pertaining to the expenses incurred in selling the wood, including, for example, the cost of removal.  The evidence on summary judgment is thus insufficient to prove that Goodrich's business is or has been profitable.

Moreover, even assuming Dr. Shmulsky's challenged expert testimony on valuation were admissible, his expert opinion does not cure Goodrich's evidentiary deficiency.  Shmulsky's estimate was based on the prevailing market rates of antique wood as well as on his "vast expertise in wood products" and as a contractor, *not* on Goodrich's subsequent history of revenue or profits.  [Doc. 40, p. 21]; see Mkt. Place, 227 Ga. App. at 423, 489 S.E.2d at 166 (concluding that expert testimony on lost profits of new business based on prevailing industry standards was insufficient).  An estimate

19

grounded on prevailing industry standards is insufficient to prove Goodrich's own anticipated lost profits.

Thus, should Goodrich seek damages for loss of inventory, Goodrich may only recover for the diminution of value.  See Champion, 263 Ga. App. at 290, 587 S.E.2d at 406 ("If there is insufficient history of revenue and costs to permit a recovery for lost profits, then any recovery is limited to damages for the lost inventory.").  Accordingly, SWWC's request to exclude lost profits damages is **GRANTED**.

The court next considers SWWC's argument that Goodrich cannot recover the replacement cost of Building A.  Under Georgia law, the appropriate measure of damages for the loss of personal property is the cost of replacement or repair. Oglethorpe Realty Co. v. Hazzard, 172 Ga. App. 98, 99, 321 S.E.2d 820, 822 (1984). Thus,

> [t]he value of the property destroyed, or the cost of restoring or replacing
> such property, is the proper measure of damages for the destruction of
> buildings, fences, and other improvements, which may at once be
> replaced, where the exact cost of restoring the property destroyed is
> capable of definite ascertainment, and where there is no damage to the
> realty itself.

NEDA Constr. Co. Inc. v. A. H. Jenkins, 137 Ga. App. 344, 350-51, 223 S.E.2d 732, 738 (1976) (quotation omitted).  Here, there is no alleged damage to the realty, only

20

damage to the hardwood floors in Building A.  Thus, at the point in the analysis,

replacement costs appears to be the appropriate form of recovery.

If, however, as SWWC contends, restoring Building A to its condition at the

time of destruction is "absurd," then diminution in value is the appropriate measure

of damages.  Overby v. State of Ga., ---S.E.2d---, ---, No. A12A0087, 2012 WL 1521989,

at *2 (May 2, 2012) (quotation and citation omitted).  However, there is an "exception

to the exception" when,

> [T]he improved realty has historical or other intrinsic worth to the owner
> which is not reflected in the fair market value of the improved realty, the
> measure of damages is the cost of repair, even though this may result in
> a recovery which far exceeds the fair market value of the improved
> realty prior to injury.

Am. Pest Control v. Pritchett, 201 Ga. App. 808, 810, 412 S.E.2d 590 (1991).  Thus, the

Court's critical inquiry is whether replacing Building A would be an absurd

undertaking, and, if so, whether Building A has historical value to Goodrich.

Reading the facts in the light most favorable to Goodrich, the Court concludes

that replacing the flooring in Building A would be an absurd undertaking.  Replacing

the damaged flooring in Building A necessarily requires the replacement of the entire

floor, an area significantly larger than the actual damaged area.  Such replacement

"would far exceed the value of the improvement and provide a windfall to the injured

21

party." <u>John Thurmond & Assocs., Inc. v. Kennedy</u>, 284 Ga. 469, 472 n.3, 668 S.E.2d 666 (2008) (citing <u>Small v. Lee & Bros.</u>, 4 Ga. App. 395, 832, 61 S.E. 831 (1908)); <u>Mercer v. J&M Transp. Co., Inc.</u>, 103 Ga. App. 141, 143, 118 S.E.3d 716 (1961) (measuring diminution in value where restoration of home would have required construction of entirely new home).  Based on the record before the Court, the Court concludes that no reasonable juror would find replacement costs to Building A to be reasonable.

The Court notes, however, that its instant conclusion is not based on SWWC's assertion that the replacement would exceed the fair market value of the entire Property.  Such an argument is not supported by existing Georgia law, and the Court declines to now so hold.  <u>Thurmond</u>, 284 Ga. at 473 ("we are not persuaded that [Georgia case law] was intended … to create an immutable rule that damages may never exceed the fair market value of the property").  Instead, the Court's conclusion is based on Georgia's underlying rule that "damages are intended to place an injured party … in the same position they would have been if the injury had never occurred." <u>Id.</u> at 469.  Here, the only evidence of the replacement cost to Building A is Goodrich's retained expert, Dr. Shmulsky, whose damages estimate far exceeds the actual injury suffered by Goodrich and would, if awarded, put Goodrich in a better position than if

the injury had never occurred.  Accordingly, the Court concludes that, as a matter of law, replacement costs for Building A would be an absurd undertaking.

The Court next considers if the exception to the exception applies to the facts of this case.  Again, reading the facts in the light most favorable to Goodrich, it appears that Goodrich did contemplate renovating Building A, depending on the availability and receipt of state historic tax credits, but never formally filed for any state historic designations.  Apart from this, the record is bereft of any evidence to support the conclusion that Building A has historical worth or intrinsic value to Goodrich. Accordingly, the Court concludes that the exception to the exception does not apply to the instant case, and thus, Goodrich may only recover diminution in value for the damages to Building A.  See Am. Pest Control, 201 Ga. App. at 809 (where there is more than one appropriate measure of damages for injury to improved realty based on facts, then  jury should decide which form of damages is appropriate); Thurmond, 284 Ga. at 472 n.3 ("Whether the facts in a particular controversy justify the application of the rule of damages permitting recovery for the amount of the reasonable cost of repairing the defects, or whether the facts are such as to require application of the diminution in value rule, is a question ordinarily determined by the trial court based on the varying facts and circumstances of each case.").

In sum, Goodrich may not recover lost profits damages in either building nor may it recover replacement costs in Building A. Accordingly, SWWC's Motion to limit Goodrich's damages to diminution in value for both buildings is **GRANTED**.

4. Spoliation

In a final attempt to further limit Goodrich's recoverable damages, SWWC argues that Goodrich's decision to demolish Building B before giving SWWC the opportunity to inspect it should preclude Goodrich from recovering damages to Building B.  Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use in pending or reasonably foreseeable litigation."  Graff v. Baja Marine Corp., 310 F. App'x 298, 301 (11th Cir. 2009) (internal quotations and citations omitted).   As the party seeking sanctions, SWWC has the burden of proving spoliation.  In re Delta/AirTran Baggage Fee Antitrust Litig., 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011).  To meet this burden, SWWC must prove that the missing evidence existed at one time; that the alleged spoliator had a duty to preserve the evidence; and that the evidence was crucial to his case.  Id.

If it is found that evidence has in fact been spoliated, the court must then decide whether sanctions are warranted, and, if so, what sanctions to impose.  Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir. 2005).   In making this

24

determination, the following five factors should be considered: (1) whether the movant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the alleged spoliator acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence is not excluded.  Id.

Although, the degree or nature of bad faith necessary for the imposition of spoliation sanctions is not entirely clear, "the relative culpability of the parties is important."  Stanfill v. Talton, --- F. Supp. 2d ---, ---, No. 5:10-CV-255(MTT), 2012 WL 1035385, at *8 (M.D. Ga. Mar. 29, 2012).  Simple negligence, by itself, is not enough to establish bad faith; however, a finding of actual malice is not required either.  Id. 2012 WL 1035385, at *9.

Here, assuming arguendo that SWWC can establish its initial burden of proving that crucial evidence was spoliated, the Court concludes that Goodrich did not act in bad faith.  First, SWWC plainly concedes that Building B was demolished in the ordinary course of business: "SWWC will not go so far as to contend that Building B was demolished in an act to deprive SWWC of important evidence.  SWWC concedes that Building B was demolished in the ordinary course of the demolition of the buildings at the Property."  [Doc. 40-1 at 15-16].  Although SWWC characterizes

25

Goodrich's decision as "an intentional, conscious decision" to "destroy Building B prior to giving SWWC any opportunity to assess the wood damage," SWWC acknowledges that this decision "may have been [made] for reasons other than to deprive SWWC of necessary evidence" and done "in the ordinary course of business." Id. At best, SWWC argues that Goodrich's actions were negligent, an insufficient level of culpability to meet the bad faith factor.  See Stanfill, 2012 WL 1035385, at *8.

Additionally, SWWC will suffer minimal, if any, prejudice as a result of the demolition.  Although SWWC asserts that it cannot challenge the nature or scope of the damage that Goodrich claims to have existed in Building B, the Court disagrees as SWWC is certainly free to offer its own expert who can likewise testify about this issue.  Even assuming that the opinions of Dr. Shmulsky are admissible, which the Court discusses below, Dr. Shmulsky did not witness the damage in Building B, and thus is not offering an opinion that cannot be obtained by another expert.

Moreover, the little, if any, prejudice against SWWC can easily be cured.  Before its demolition, Building B was investigated by three experts retained in the Companion Case.  Of these three experts, SWWC has identified Arnold and Dawkins as two of its own potential expert witnesses.  In particular, Dawkins inspected, photographed, and conducted an infrared examination of the hardwood floors, and

his report is available to SWWC.  Further, unlike Dr. Shmulsky, these experts *did*

investigate Building B before demolition.  Thus, any prejudice that SWWC may suffer

can be easily cured.  Accordingly, the Court concludes that spoliation sanctions are

inappropriate, and SWWC's Motion to exclude Goodrich's claim for damages in

Building B is **DENIED**.

Based on the foregoing, SWWC's Motion for Summary Judgment is **GRANTED**

**in part** and **DENIED in part.**

## MOTIONS TO EXCLUDE EXPERT TESTIMONY

### Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence

702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786

(1993), and its progeny.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

27

Fed. R. Evid. 702 (as amended effective Dec. 1, 2011).   The Eleventh Circuit has condensed Rule 702 into three broad requirements known as the "qualifications," "reliability" and "helpfulness" prongs.   See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

When evaluating the reliability of scientific expert testimony, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and…whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592–93.  In assessing reliability, a trial court has "considerable leeway" in deciding which tests or factors to use.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  In Daubert the Supreme Court suggested that a district court consider testability, error rate, peer review and publication, and general acceptance of an expert's opinion when evaluating the reliability of an expert's scientific testimony.  Daubert, 509 U.S. at 593–95.  These factors, however, are generally inapplicable in the context of non-scientific testimony.  See Kumho, 526 U.S. at 152 (holding that expert's personal knowledge and expertise are relevant in non-scientific expert testimony).  In such cases, as is the case here, the Advisory Committee Notes for Rule 702 suggest that courts consider factors such as:

28

(1) Whether [the expert] is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether [he has] developed [his] opinion expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3) Whether the expert has adequately accounted for obvious alternative explanations;

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee's note (2000 amends.) (citations and internal quotations omitted).

In evaluating the expert's testimony in light of these factors, the trial court must remain mindful that "Daubert does not require certainty; it requires only reliability." Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1198 n.10 (11th Cir. 2010).  The focus of reliability "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

Expert testimony must also actually help the trier of fact to understand the facts in evidence or to determine a fact in issue.  This consideration "goes primarily to relevance." Daubert, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful." Frazier, 387 F.3d at 1262

(citation and internal quotation marks omitted).  In other words, "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Id.</u> at 1262‑63.  Expert testimony also does not help the trier of fact if it fails to "fit" with the facts of the case. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1299 (11th Cir. 2004).  This occurs when "a large analytical leap must be made between the facts and the opinion." <u>Id.</u>  The court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand." <u>Bitler v. A.O. Smith Corp.</u>, 391 F.3d 1114, 1121 (10th Cir. 2004).  Expert testimony is additionally helpful "if it concerns matters that are beyond the understanding of the average lay person." <u>Frazier</u>, 387 F.3d at 1262.

Ultimately, however, the trial court's gatekeeping role under <u>Daubert</u> "is not intended to supplant the adversary system or the role of the jury." <u>Allison v. McGhan</u>, 184 F.3d 1300, 1311 (11th Cir. 1999).  Where the basis of expert testimony satisfies Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." <u>Daubert</u>, 509 U.S. at 596.

With the above legal standards in mind, the Court will address the challenged opinions of each expert in turn below.

30

## Discussion

### Dr. Rubin Shmulsky

Dr. Rubin Shmulsky earned his Masters and Doctorate degrees in Forest Products from Mississippi State University where he is currently a Professor of Forest Products and department head.  In total, Dr. Shmulsky has nearly twenty-eight years of experience in the field of wood science.  He has also co-authored three textbooks on the subject of forest products and written numerous articles about wood composition, wood strength, wood damage and detection, and wood drying.  Prior to receiving his degrees, Dr. Shmulsky worked as a contractor "intermittently" from 1993 to 1998. Shmulsky Dep. 40:15-16, Aug. 30, 2011 [Doc. 53 at 11].  As a contractor, he worked with reclaimable wood, including pine, and with wood-based construction and demolition.

In retaining Dr. Shmulsky, Goodrich asked that he review the facts and circumstances of the present case and offer his opinion as to (1) the qualitative extent of the alleged water damage in Buildings A and B; (2) the volume of damaged wood in Buildings A and B; and (3) the amount of financial damage to the wood and potential replacement costs of the factory flooring in both buildings.  Dr. Shmulsky has thus offered the following opinions:

31

**Opinion 1**: The undamaged wood is in "very decent" condition with mostly superficial scratches.  Shmulsky Expert Report I at 2 [Doc. 48-1 at 33].  The undamaged wood could be refinished for use "as is" or taken up, denailed, lightly sanded, and refinished—a process known as "remilling."  Id. at 2 [Doc. 48-1 at 33].

**Opinion 2**: The hardwood floorboards have sustained substantial water damage from flooding, including "buckling," "cupping," "edge shrinking and swelling," and "compression set" damage.  Buckling occurs when two or more floorboards lift up as a result of being squeezed by the swelling floorboards that have come into contact with water.  Compression set occurs as the edges of each individual floorboard press against the adjacent floorboards and becomes crushed internally.  Cupping occurs when the top face of the board becomes concave as a result of the wet edges and underside of the floorboard, causing the bottom face to be wider than the top face.  Edge shrinking and swelling occurs in floorboards with compression set, or crushed, edges.

**Opinion 3**: Buckling, cupping, and edge shrinking and swelling are visible in the wood upon mere observation.  Compression set damage affects the subfloor and is only visible upon lifting up the top layer.  Here, it is unnecessary to remove the top layer in order to conclude that compression set damage is present in the subfloor because of the observable extent and amount of buckling in the top maple layer.

**Opinion 4**: Goodrich should completely replace the wood factory flooring due to the substantial amount of time and expense involved with repairing the flooring.

**Opinion 5**: The extent of water damage in Building B is the same degree as the damage in Building A.[11]

---

[11] This opinion is not specifically listed in either Report, however, Dr. Shmulsky makes this finding in his deposition testimony and this opinion serves as a basis for his subsequent valuation opinions.

32

**Opinion 6**: A combined total of 45,000 square feet of flooring has sustained water damage: 30,000 square feet in Building A and 15,000 square feet in Building B.

**Opinion 7**: The net salvage value for the undamaged wood flooring in Buildings A and B is $1,020,623.  This is the gross sale value of the wood that is recovered and upgraded less the cost of removal."  Shmulsky Dep. 63:4-6, Aug. 30, 2011 [Doc. 53 at 18]. Specifically, the pre-damage salvage valuation for the maple top layer was $2.25 per square foot, 25% of its undamaged final unit sale price.  The pre-damage salvage valuation for the heart of pine middle layer was $2.75 per square foot (on a one-inch thick nominal basis), 25% of its undamaged final unit sale price.

**Opinion 8**: The net salvage value for the damaged wood materials in Buildings A and B is $0.  This figure is due to the "excessive immediate yield losses," the "increased yield losses through the value chain, the increased costs associated with additional processing steps to reclaim water damaged wood," and market rejection.  Shmulsky Report II at 3 [Doc. 53-1 at 1].

**Opinion 9**: Market rejection reduces the salvage value of the damaged wood because "[d]ealers of reclaimed wood are not interested in processing this type of water damaged wood due to the increased potential for mold in service, the potential for increased claims, and the potential for voided warrantees associated with water damaged wood."  Id. [Doc. 53-1 at 1].

**Opinion 10**:  Assuming the antique factory flooring in both buildings is to be replaced, the total cost of replacement is $1,689,939.  The replacement process requires three steps: demolition and removal, replacement of wood substructure and subfloor, and installation of reclaimed maple.

**Opinion 11**: Removal and demolition will cost $736,525.  This includes "contractual labor, machinery, commodities, and materials and supplies associated with the demolition; an allowance for disposal fees; and a salvage valuation of the flooring had it not be damaged."  Id. [Doc. 53-1 at 1].

33

**Opinion 12**:  Before installing the reclaimable flooring, a contemporary floor system must be engineered so to comply with building codes that costs $350,411.  "For this redesigned factory floor system, glue laminated beams are specified.  These beams are to be installed atop the existing steel girders.  These beams are to be decked with structural tongue and proved two-by-six pine decking.  This system provides a cost-effective engineered floor system that would be acceptable for factor-level loading.  Per square foot loads were considered to be 20 pounds dead and 80 pounds live.  Stiffness was specified at L/360."  Id. [Doc. 53-1 at 1].

**Opinion 13**:  Installation and finishing the reclaimable maple top layer is $603,000, "based on $9 per square foot for the flooring and $4.40 per square foot for rosin paper, installation, sanding and finishing."  Id. [Doc. 53-1 at 1].

In light of this Court's conclusion on summary judgment that Goodrich may only recover diminution in value damages with respect to both Buildings, the Court concludes that SWWC's challenge to exclude Dr. Shmulsky's Opinions 4, 6, 7, 8, 9, 10, 11, 12, & 13, is now moot.  The Court thus focuses its analysis on Dr. Shmulsky's opinions as to the existence and extent of damage to the flooring in Buildings A and B.  Specifically, SWWC challenges Shmulsky's Opinions 2, 3, & 5: the causal link between the Flood and the alleged water damage; the existence and extent of water damage to the subfloor in Building A; and the existence and extent of water damage in Building B, respectively.

To begin, SWWC does not challenge Dr. Shmulsky's qualifications with respect to his remaining opinions.  However, the Court has extensively reviewed Dr.

Shmulsky's credentials, both expert reports, and both depositions, and finds Dr. Shmulsky's qualifications on this front to be impressive.   Accordingly, the Court concludes that Dr. Shmulsky is qualified to render Opinions 1, 2, 3, & 5.

Looking next to the remaining issues of reliability and helpfulness, it is evident that his opinions were developed expressly for the purpose of the instant litigation. See Fed. R. Evid. 702, advisory committee's notes.  Notwithstanding, these opinions are based on matters that are naturally and directly derived from his field of expertise in which he has conducted extensive research independent of the instant litigation. Accordingly, this factor weights little, if any, against their admissibility.

The Court next easily resolves SWWC's objection to Dr. Shmulsky's Opinion 2. In his deposition Dr. Shmulsky testified that "a flood" caused the damage to the flooring, not that the Flood caused the damage.  Shmulsky Dep. 119:24-25, June 21, 2011 [Doc. 48 at 30] (emphasis added).  Dr. Shmulsky reiterates this distinction by acknowledging that Goodrich did not ask him to render an opinion about the source of the water that caused the Flood.  Id. at 131:12-15 [Doc. 48 at 33].  Thus, Dr. Shmulsky does not opine, as SWWC contends, that the Flood caused the damage.

To the extent that Dr. Shmulsky concludes that the damage was caused by standing water consistent with his understanding of the extent and nature of the

Flood, the Court finds this testimony to be admissible.  Simply because Dr. Shmulsky cannot (and does not) definitively conclude that the Flood caused the damage, his testimony is still reliable.  Fisher v. Ciba Specialty Chems. Corp., No. 03-0566-WS-B, 2007 WL 2302470, at *8 (S.D. Ala. Aug. 8, 2007) ("Daubert does not require scientists to be endowed with superpowers.").  In forming his opinion, Dr. Shmulsky does not exclude other potential sources of causation and acknowledges that a definitive opinion about causation from an expert within his field would be, to his knowledge, impossible.  See Fed. R. Evid. 702, advisory committee's notes.  Moreover, opposing counsel vigorously cross-examined Dr. Shmulsky about his conclusions and Dr. Shmulsky clearly explained why he reached conclusions contrary to the alternative explanations posed by SWWC.  Any weaknesses in Dr. Shmulsky's opinion with respect to causation thus go to its weight rather than to its admissibility.  Daubert, 509 U.S. at 596.

The Court also concludes that Dr. Shmulsky's Opinion 5 (the damage in Building B is similar to the amount and extent of damage in Building A) is admissible, even though Dr. Shmulsky never observed the damage in Building B.  As an expert, Dr. Shmulsky is given "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  Daubert, 509 U.S. at 592.  Thus, Dr.

Shmulsky is certainly permitted to consult other sources about the condition and nature of the flooring in Building B as well as about the Flood to form his own logically constructed conclusions about Building B and its sustained damage.  If, as SWWC contends, Dr. Shmulsky relied on biased sources to form his opinions, i.e. Goodrich and Goodrich's counsel, these potential weaknesses in his testimony only go to the weight of the opinions and not their admissibility.  <u>Daubert</u>, 509 U.S. at 596; Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed.") (emphasis added); <u>Viterbo v. Dow Chem. Co.</u>, 826 F.2d 420, 422 (5th Cir. 1987) ("Questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

Likewise, Dr. Shmulsky's conclusion that compression set damage is present in Building A's subflooring (Opinion 4) is also admissible.  Although he never visually observed this damage to the subfloor, he testified that the nature and extent of the visible buckling in the top maple layer indicates that compression set is present in the subfloor.  Dr. Shmulsky's conclusion is logically constructed and is clearly explained in response to vigorous cross-examination by opposing counsel.  Again, any

weaknesses in his opinions go to the weight of the evidence, not its admissibility. Daubert, 509 U.S. at 592.

The Court additionally finds that Dr. Shmulsky's opinions as to causation and the nature and extent of damage in both buildings may be helpful to the jury.  Dr. Shmulsky is, undisputedly, an expert in wood sciences and the various types of water damage found in the floorboards is likely to be "beyond the understanding of the average lay person."  Frazier, 387 F.3d at 1262.

For these reasons, SWWC's Motion to Exclude the Expert Opinions of Dr. Rubin Shmulsky [Doc. 54] is **DENIED in part** and **TERMINATED as MOOT** in part.  Dr. Shmulsky is permitted to offer his Opinions 1, 2, 3, & 5 in regards to both buildings. With respect to SWWC's argument to exclude Dr. Shmulsky's replacement costs opinions, SWWC's challenge is **TERMINATED as MOOT** in light of the Court's conclusion that Goodrich is entitled to recover only diminution in value with respect to both buildings.   Should Goodrich offer Dr. Shmulsky's opinions to prove diminution in value, and should SWWC challenge their admissibility, the Court will then, if necessary, consider their admissibility.

**Carl Michael Gates**

38

The Court next considers Goodrich's Motion to exclude portions of insurance adjustor Carl Michael Gates' testimony.  Although Gates was retained as an expert witness by Companion Case plaintiff Faraday, neither party has identified nor retained him as an expert witness in this case.  Notwithstanding, in its Motion, filed as a "Notice of Incorporation and Adoption of its Motion in the Companion Case," Goodrich argues that Gates is unqualified to testify about the valuation of reclaimed wood and the actual cash value of the real property owned by Goodrich, and that Gates' methodology regarding the co-insurance provision in the insurance policy is unreliable.  In response, SWWC does not oppose Goodrich's Motion, and instead seeks to broaden Goodrich's requested exclusion to apply to *all* of Gates' testimony because Gates is not identified as an expert in this case.

Without ruling on the merits of Goodrich's Motion, Goodrich's Motion to Exclude Portions of Gates' Testimony [Doc. 55] is **GRANTED** because SWWC does not object to Goodrich's request.  Thus, Gates is excluded from testifying about the valuation of reclaimed wood, the actual cash value of the real property owned by Goodrich, and the co-insurance provision in the insurance policy.  The Court, however, refrains from excluding *all* of Gates' testimony.  Such a ruling would be unnecessary and based largely on speculation without the benefit of proper briefing

from the parties.  Thus, at this juncture, the Court declines to exclude all of Gates' opinion.

Lastly, to the extent that SWWC argues that Gates' personal observations about the buildings are admissible lay opinions, the Court notes that excluding some or even all of Gates' expert opinion does not preclude Gates from testifying about matters otherwise admissible under Rule 701.  <u>See</u> Fed. R. Evid. 701 (allowing lay witness opinion testimony if witness is not testifying as an expert and, in part, does not form opinion on knowledge within the scope of Rule 702).  Here, because Goodrich does not challenge Gates' testimony under Rule 701, the Court declines to presently consider this issue.

<u>CONCLUSION</u>

Based on the aforementioned, SWWC's Motion for Summary Judgment [Doc. 40] is **GRANTED in part** and **DENIED in part**.  SWWC's Motion is **GRANTED** as to Goodrich's claims for attorneys' fees, punitive damages, nuisance, lost profits damages, and replacement cost damages in both buildings.  SWWC's Motion is **DENIED** with respect the proximate causation element of Goodrich's trespass and negligence claims and with SWWC's its request to exclude Goodrich's damages for Building B.  Additionally, Goodrich's Request for Oral Argument [Doc. 77] is **DENIED**

and Goodrich's claims against Defendant John Doe are **DISMISSED**.  Thus, as it presently stands, Goodrich's trespass and negligence claims will proceed to trial, and, if successful, Goodrich's recoverable damages is limited to diminution in value only for both buildings.

Because the Court recognized Goodrich's negligence claim, the Court will entertain an additional dispositive motion from SWWC related only to this negligence claim, with the exception of any causation and damages arguments.  Said motion must be **filed within seven (7) days from the date of this Order, and the parties' responses and replies thereto are to be filed within seven (7) days of those filings**.

SWWC's Motion to Exclude Dr. Rubin Shmulsky's expert opinion [Doc. 54] is **DENIED in part** and **TERMINATED as MOOT in part.**  SWWC's Motion is **DENIED** with respect to Opinions 1, 2, 3, & 5.  SWWC's Motion is **TERMINATED as MOOT** with respect to Opinions 4, 6, 7, 8, 9, 10, 11, 12, & 13.  Finally, Goodrich's Motion to Exclude Certain Testimony of Carl Michael Gates [Doc. 55] is **GRANTED**.  Mr. Gates' expert opinion about the valuation of reclaimed wood, the actual cash value of the real property owned by Goodrich, and the co-insurance provision in the Policy is excluded.

**SO ORDERED,** this 4th day of September, 2012.

41

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

LMH